**SANDVIK AB, AB Sandvik Steel and Sandvik Steel Company, Plaintiffs,**

v.

**UNITED STATES, United States Department of Commerce and United States International Trade Commission, Defendants,**

and

**Al Tech Specialty Steel Corporation and Carpenter Technology Corporation, Defendant–Intervenors.**

Court No. 87–12–01211.

United States Court of International Trade.

Sept. 14, 1989.

Akin, Gump, Strauss, Hauer & Feld (Warren E. Connelly, Rory F. Quirk), Washington, D.C., for plaintiffs Sandvik AB, AB Sandvik Steel and Sandvik Steel Co.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., M. Martha Ries, Lyn M. Schlitt, Gen. Counsel, James A. Toupin, Asst. Gen. Counsel, U.S. Intern. Trade Com'n., Washington, D.C., Timothy M. Reif, New York City, Matthew P. Jaffe, of Counsel, Office of the Chief Counsel, for Import Admin., U.S. Dept. of Commerce.

Collier, Shannon, Rill & Scott, David A. Hartquist, Washington, D.C., for defendant-intervenors Al Tech Specialty Steel Corp. and Carpenter Technology Corp.

## OPINION AND JUDGMENT

CARMAN, Judge:

Sandvik AB, AB Sandvik Steel and Sandvik Steel Company (hereinafter plaintiffs) move pursuant to Rule 56.1 for judgment upon the agency record contending that the final affirmative determination of the United States International Trade Commission (hereinafter ITC) in *Stainless Steel Pipes and Tubes from Sweden*, USITC Pub. No. 2033 (Nov.1987) 52 Fed.Reg. 45,256 (Nov. 25, 1987) and the final affirmative determination of the Department of Commerce, International Trade Administration (hereinafter Commerce or ITA) in *Final Determination of Sales at Less Than Fair Value; Stainless Steel Hollow Products From Sweden*, 52 Fed.Reg. 37,810 (Oct. 9, 1987) *as amended* 52 Fed.Reg. 45,985 (Dec. 3, 1987) are not supported by substantial evidence on the record or otherwise not in accordance with law. Defendants and defendant-intervenors oppose the motion and seek affirmation of the determinations.

## BACKGROUND

The ITA received on October 17, 1986 a petition filed by the Specialty Tubing Group (hereinafter Specialty Tubing), which was amended to include the United Steelworkers of America (hereinafter United Steelworkers) on February 6, 1987, on behalf of the United States domestic industry producing certain stainless steel hollow products (hereinafter SSHP) alleging that imports of SSHP were being or were likely to be sold in the United States at less than fair value and that imports were causing material injury or threatened material injury to a United States industry. Specialty Tubing was made up of six domestic producers, two of which were defendant-intervenors Al Tech Specialty Steel Corporation (hereinafter Al Tech) and Carpenter Technology Corporation (hereinafter Carpenter) who produced the seamless SSHP. The ITA made a preliminary affirmative determination and notified the ITC. *Certain Stainless Steel Hollow Products From Sweden; Preliminary Determination of Sales at Less Than Fair Value*, 52 Fed. Reg. 19,369 (May 22, 1987).

The ITC determined that an industry in the United States was materially injured by reason of imports from Sweden of seamless stainless steel pipes, tubes, hollow bars and blanks that had been found by the ITA to have been sold at less than fair value in the United States. USITC Pub. No. 2033 at 1. The ITC found that there was no material injury or threat of material injury and that an industry within the United States was not materially retarded by reasons of imports from Sweden of welded stainless steel pipes, tubes hollow bars and blanks that had been found by the ITA to have been sold in the United States at less than fair value. *Id.*

## CONTENTIONS OF THE PARTIES

*Plaintiffs' Contentions*

Plaintiffs make the following contentions:

(1) petitioners did not have standing to file their petition for the following reasons:

(a) a majority of the domestic industry did not support the petition;

(b) petitioners have an affirmative burden of proving that they represent a majority of the domestic industry;

(c) the United Steelworkers do not satisfy the interested party requirement of the statute; and

(d) the ITA based its standing determination on the class or kind of merchandise as opposed to whether the merchandise was a like product.

(2) The material injury causation analysis of the ITC was flawed for the following reasons:

(a) the ITC failed to recognize the distorting impact of the data of domestic producer Babcock & Wilcox which left the seamless stainless steel pipe and tube industry in 1985;

(b) the ITC failed to analyze correctly the data gathered concerning the indicators of material injury and causation;

(c) redrawers, also known as non-integrated producers, were included as part of the domestic industry, but were not included in the analysis of whether the domestic industry suffered material harm; and

(d) Sandvik Steel Company, a domestic producer of seamless stainless steel pipes and tubes, was erroneously excluded from the domestic industry for the purposes of the ITC's injury analysis on the ground that it was a related party.

(3) The ITC erroneously found that the alleged material injury suffered by the domestic industry was caused by less than fair value imports from Sweden.

(4) The determination of sales made by Sandvik at less than fair value was flawed for the following reasons:

(a) the ITA erroneously deducted from its calculation of the United States Price in exporter's sales price transactions, part of the profit which Sandvik Steel Company made on its domestic sales of products which it further processed;

(b) the ITA failed to match comparable quantities of merchandise sold in the United States and in the home market (or third country). Where such matches could not be made, the ITA failed to make any adjustment for the effect of quantity on price despite plaintiffs' demonstration of the relationship between quantity and price; and

(c) the ITA erroneously calculated the United States price on the basis of sales which plaintiffs made to an unrelated reseller located in a third country.[1]

*Defendants' Contentions*

Defendant ITA contends the following determinations were reasonable, supported by substantial evidence on the record and in accordance with law:

(a) the ITA's initiation of the anti-dumping duty investigation;

(b) the ITA's determination that the petition was filed on behalf of the domestic industry;

(c) the ITA's determination that the United Steelworkers were properly joined as a co-petitioner;

(d) the ITA's determination to deduct from the exporter's sales price the profit associated with the cost of additional manufacture and sale of finished product in the United States;

(e) the ITA's denial of Sandvik's claimed quantity adjustment;

(f) the ITA's determination to include within its purchase price calculations, sales from Sandvik to an unrelated middleman.

Defendant ITC contends its determination, including the following specific decisions, was reasonable, supported by substantial evidence on the record and in accordance with law:

(a) the ITC's decision to exclude data for Sandvik Steel Company from the domestic industry data under the related parties provision of the statute;

(b) the ITC's analysis which explicitly described and considered data for redrawers as well as integrated producers in its material injury analysis;

(c) the ITC's analysis of data relating to the condition of the domestic industry as a whole, including aggregate data for integrated producers; and

(d) the ITC's analysis of the volume of the subject imports and their price effects.

---

**1.** In their reply brief, plaintiffs withdrew their contention that the ITA failed to adjust foreign market values to reflect the difference in production costs when matching sales of hollow bar in the United States with sales of hollow bar in Sweden. Plaintiffs' Reply to the Memoranda of Defendants and Defendant–Intervenors in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record at 101.

*Defendant–Intervenors' Contentions*

Defendant-intervenors Al Tech and Carpenter Corporation contend that the final affirmative determinations of the ITA and the ITC should be affirmed in all respects.

## STANDARD OF REVIEW

In reviewing an antidumping investigation and determination, this Court must hold unlawful any determination unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). "[T]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo....*'" *American Spring Wire Corp. v. United States*, 8 CIT 20, 22, 590 F.Supp. 1273, 1276 (1984) (quoting *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465), *aff'd sub nom. Armco, Inc. v. United States*, 3 Fed.Cir. (T) 123, 760 F.2d 249 (1985).

## STANDING

Pursuant to section 1673a of 19 U.S.C., there are two methods of initiating an antidumping duty investigation. The investigation may be commenced by either the ITA on its own initiative (19 U.S.C. § 1673a(a)) or by the filing of a petition (19 U.S.C. § 1673a(b)) as was done by Specialty Tubing in the instant case. This petition was amended to include the United Steelworkers. The ITA determined that the petitioners had satisfied the requirements as set out in 19 U.S.C. § 1673a(b)(1). The Statute reads as follows:

(b) Initiation by petition

(1) Petition requirements

An antidumping proceeding shall be commenced whenever an interested party described in subparagraph (C), (D), (E), or (F) of section 1677(9) of this title files a petition with the administering authority, on behalf of an industry, which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title, and which is accompanied by information reasonably available to the petitioner supporting those allegations. The petition may be amended at such time, and upon such conditions, as the administering authority and the Commission may permit.

19 U.S.C. § 1673a(b)(1) (1982 & Supp. V 1987).

An "interested party" includes "a manufacturer, producer, or wholesaler in the United States of a like product," 19 U.S.C. § 1677(9)(C) (1982), as well as "a certified union or recognized union group of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a like product," 19 U.S.C. § 1677(9)(D) (1982 & Supp. V 1987).

A "like product" is defined as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle." 19 U.S.C. § 1677(10) (1982).

"Industry" is defined as "the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product...." 19 U.S.C. § 1677(4)(A) (1982 & Supp. V 1987).

Plaintiffs contend that Specialty Tubing and the United Steelworkers of America did not bring their petition on behalf of the domestic industry producing the merchandise and thus lacked standing.

The two statutory requirements for standing were outlined in *Gilmore Steel Corp. v. United States*, 7 CIT 219, 585 F.Supp. 670 (1984). The petitioner must be an interested party and must show that a majority of the industry supports the petition. 7 CIT at 226, 585 F.Supp. at 676.

In the instant case, plaintiffs make three contentions: (1) Specialty Tubing and the

United Steelworkers have an affirmative burden of proving that they represent a majority of the domestic industry; (2) the United Steelworkers do not satisfy the interested party requirement of the statute; and (3) the ITA based its standing determination on the class or kind of merchandise as opposed to whether the merchandise was a like product.

### Representing a Majority of the Domestic Industry

■ Plaintiffs' claim that the petitioners have an affirmative burden of proving they represent a majority of the industry is unfounded. This Court has recently looked at the standing issue and determined that "[n]either the statute nor Commerce's regulations require a petitioner to establish affirmatively that it has the support of a majority of a particular industry, and the Court declines to impose such a requirement." *Citrosuco Paulista, S.A. v. United States*, 12 CIT ——, 704 F.Supp. 1075, 1085 (1988). The ITA has stated that such a requirement "would be so onerous as to preclude access to import relief under the antidumping and countervailing duty laws." *Frozen Concentrated Orange Juice From Brazil: Final Determination of Sales at Less Than Fair Value*, 52 Fed.Reg. 8,324, 8,325 (Mar. 17, 1985).

The ITA stated in its final determination in the instant case:

> Where domestic industry members opposing an investigation provide a clear indication that there are grounds to doubt a petitioner's standing, the Department will review whether the opposing parties do, in fact, represent a major proportion of the domestic industry. In this case, we have not received any opposition from the domestic industry.

52 Fed.Reg. at 37,812.

This Court follows *Citrosuco Paulista* in holding that petitioners do not have a burden of proving they represent a majority of the domestic industry.

### Interested Party

■ Plaintiffs contend that the United Steelworkers are not an interested party because they could not meet the two-step requirements of (1) representing workers in the domestic industry and (2) representing workers employed by producers whose collective output constitutes a majority of the domestic industry. Plaintiffs claim that this two-step test is derived from the two-part test in *Gilmore Steel* which was stated *supra* (the petitioner must be an interested party and must show that a majority of the industry supports its petition). Plaintiffs also contend that this two-step requirement determines whether the union workers are "representative of an industry."

Plaintiffs are misstating the requirements for an "interested party." As stated earlier an "interested party" may include "a certified union or recognized union or group of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a like product." 19 U.S.C. § 1677(9)(D). The United Steelworkers certainly qualify as a recognized union group of workers engaged in the production of a like product since they represent workers at the majority of all integrated seamless stainless steel pipe and tube producers as well as workers at redraw mills that manufacture a majority of all products produced by United States redrawers other than plaintiffs. ITA Record Document (hereinafter ITA R.) 52, 53; ITA Confidential Document (hereinafter ITA C.) 10.

This Court holds that the ITA's determination that the United Steelworkers had standing was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

### Class or Kind Versus Like Product

■ Plaintiffs argue that the ITA improperly determined that seamless and welded SSHP were one like product. If the ITA had determined, as did the ITC, that these SSHPs were separate like products, plaintiffs contend that Specialty Tubing would not have standing to initiate the petition.

Plaintiffs' contention confuses the separate roles of the ITC and the ITA as well as the time sequence in which the two interact.

According to statute, the ITA must determine within twenty days after the filing of a petition whether that petition sets forth the allegations and information necessary for initiating an antidumping investigation. 19 U.S.C. § 1673a(c) (1982). The ITA's standing determination is for the limited purpose of deciding whether petitioners have filed "on behalf of the domestic industry." The ITA relies upon the petitioners' representations regarding the definitions of like product and domestic industry. Specialty Tubing in its petition, defined the industry to include both seamless and welded stainless steel pipe and tube. ITA R. 1 at 4; ITA C. 1 at 4. Specialty Tubing stated that it was "filing th[e] petition on behalf of U.S. producers of specialty tubing." ITA R. 1 at 2.

The ITA initiated the investigation based upon Specialty Tubing's representations and then notified the ITC. *Initiation of Antidumping Duty Investigations; Certain Stainless Steel Hollow Products From Sweden*, 51 Fed.Reg. 41,514 (Nov. 17, 1986). It was after this notification that the ITC began its investigation, made its determination of material injury and defined the domestic industry and like product. USITC Pub. No. 2033 at 1, 3–5. The fact that the ITC determined that seamless and welded SSHP constituted separate like products had no bearing on the ITA's determination that the petitioners had standing. The ITA's standing determination is made within the first twenty day period after the filing of the petition and is not connected in any way with the ITC's like product determination which is a separate determination for the purpose of determining injury.

Plaintiffs' further contention that the ITA based its standing determination on the class or kind of merchandise instead of the like product is erroneous. This contention is based upon the ITA's response to plaintiffs' Comment 2 of the final determination in which plaintiffs argued two separate issues: (1) lack of standing of the petitioners and (2) seamless and welded SSHP as a separate class or kind of merchandise. 52 Fed.Reg. at 37,812. The ITA's response, "We consider all products

covered by this investigation to constitute a single class or kind of merchandise as stated in our response to Comment 1" is an answer to plaintiffs' comment, "Sandvik argues that seamless SSHP is a separate class or kind of merchandise, therefore, petitioners must represent the affected industry." *Id.* In responding to Comment 2, the ITA referred back to its response to Comment 1 which was limited to the sole issue of class or kind of merchandise. The ITA then moved on to discuss the standing issue which plaintiffs had combined with the class or kind issue. Any supposition by plaintiffs that the ITA used the class or kind designation instead of the like product is clearly mistaken.

## MATERIAL INJURY CAUSATION ANALYSIS

Plaintiffs claim that the material injury causation analysis of the ITC was flawed because: (1) the distorting impact of Babcock & Wilcox was not recognized; (2) the data concerning indicators of material injury and causation were not analyzed correctly; (3) redrawers were included as part of the domestic industry, but excluded from the material harm analysis; and (4) Sandvik Steel Company, a domestic producer of seamless stainless steel pipes and tubes, was erroneously excluded from the domestic industry as a related party. The Court will examine each issue separately in order to determine whether the ITC's determination was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

### *Babcock & Wilcox*

■ Plaintiffs contend that the ITC had an obligation to examine the reasons why Babcock & Wilcox left the seamless stainless steel pipe and tube business in 1985 and to do one of the following: exclude the data, place the impact of the data in the context of the investigation or not accord undue weight to the data. In prehearing briefs, plaintiffs asserted that the departure of Babcock & Wilcox was due to several factors including: the disappearance of new construction in the power and petroleum industries, the company's decision not

to update its technology, the loss of in-house construction projects and lack of experience in small-lot orders. ITC Record Document (hereinafter ITC R.) 84 at 25–26 and Exhibit A at 15–16, 23–24, 59–60.

Defendant ITC correctly points out that the ITC may only exclude data from a member of the domestic industry if that member is a related party within the meaning of 19 U.S.C. § 1677(4)(B) (1982) and the ITC has determined that "appropriate circumstances" existed to exclude the data. Since Babcock & Wilcox do not meet this criteria, its data can not be excluded.

In addition, there is no basis for a firm by firm analysis of the condition of the domestic industry as requested by plaintiffs. As the Court noted in *Copperweld Corp. v. United States:*

> Section 1673d(b)(1) requires that the ITC make and publish a final determination of whether a "domestic industry" is materially injured by reason of the subject imports. The domestic industry is further defined as "the domestic producers *as a whole* of the like product...." 19 U.S.C.A. § 1677(4)(A).... This language makes manifestly clear that Congress intended the ITC determine whether or not the domestic industry (as a whole) has experienced material injury due to the imports. This language defies the suggestion that the ITC must make a disaggregated analysis of material injury.

12 CIT ——, 682 F.Supp. 552, 569 (1988) (emphasis in original).

In response to a similar claim that the ITC acted contrary to law because it accepted aggregated data when the petitioner had offered testimony to indicate injury to a major portion of a United States industry, the Court in *National Ass'n of Mirror Mfrs. v. United States* held that the ITC acted in accordance with law in considering the industry as a whole where no allegation of regional industry was made under 19 U.S.C. § 1677(4)(C) (1982). 12 CIT ——, 696 F.Supp. 642, 647–48 (1988).

This Court finds that the ITC's treatment of the Babcock & Wilcox data was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

*Indicators of Material Injury*

█ Plaintiffs contend that the ITC failed to correctly analyze the data gathered concerning the indicators of material injury. According to the final determination, the ITC considered domestic consumption, United States production, capacity, capacity utilization, shipments, inventories, employment and profitability, among other factors, in determining the condition of the domestic industry. USITC Pub. No. 2033 at 10.

Plaintiffs contend that the domestic industry did not suffer sharp declines in capacity, production, shipments, employment or net sales and that the industry did not have "generally low profitability" over the period of investigation. However, the data compiled by the ITC suggest otherwise. Capacity by integrated producers declined from 21,300 short tons to 15,300 short tons between 1984 and 1986. *Id.* at 11. Production by integrated producers decreased by 11 per cent from 1984 to 1986. *Id.* Domestic shipments by integrated producers, measured by both quantity and value fell, from 8,010 short tons valued at $67.4 million in 1984 to 6,681 short tons valued at $60.2 million in 1986. *Id.* at 12. The average number of workers engaged in production of seamless stainless steel pipe fell from 407 in 1984 to 234 in 1986. *Id.* at 12, A–28. Net sales of seamless stainless steel pipe and tube declined steadily during the investigative period. *Id.* at 13. There was an increase in profitability in 1986 that was partially attributable to Babcock & Wilcox leaving the industry. *Id.*

This Court holds that the ITC's determination that the domestic seamless stainless steel pipe and tube industry suffered material injury was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

*Redrawers*

█ The ITC identified the domestic industry producing seamless stainless steel pipe and tube as (1) integrated companies that melt stainless steel, produce the basic

shapes and then make pipe or tube, and (2) redrawers, that purchase the shapes and bring the products to final form. *Id.* at 8. Plaintiffs claim that the ITC reached its injury determination without regard to the condition of the redrawers. Defendant ITC points out that redrawer information was included in the determination. For example, footnotes 32–34 to page 11 of the determination specifically identify production by redrawers which increased from 1984 to 1986, but decreased in interim (January–June) 1987 (compared with interim 1986), and redrawers' capacity which increased from 1984 to 1985, dropped in 1986 and declined in the first six months of 1987.

Defendant ITC notes that most of the data for the redrawers were analyzed separately from the data of the integrated producers in order to avoid double counting of the finished product. *Id.* at 11, n. 32. In situations where further processing of an item is involved, the practice of the ITC is to examine the data for the two groups separately. *See, e.g. Butt–Weld Pipe Fittings From Brazil and Taiwan,* USITC Pub. No. 1918 at A–10–11 (1986); *Certain Seamless Steel Pipes and Tubes From Japan,* USITC Pub. No. 1347 at A–14 (1983).

This Court holds that the ITC's analysis of redrawer data was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

*Exclusion of Sandvik Steel Company as a Related Party*

██ Plaintiffs contend that Sandvik Steel Company, a domestic producer of seamless stainless steel pipes and tubes that is wholly owned by Sandvik AB, was erroneously excluded from the domestic industry for the purposes of the ITC's injury analysis on the ground that it was a related party.

The exclusion provision reads as follows:

(B) Related parties

When some producers are related to the exporters or importers, or are themselves importers of the allegedly subsidized or dumped merchandise, the term "industry" may be applied in appropriate circumstances by excluding such producers from those included in that industry. 19 U.S.C. § 1677(4)(B).

Plaintiffs contend that circumstances do not exist to exclude Sandvik Steel Company as a related party for the following reasons: (1) Sandvik Steel Company can buy redraw hollows from other sources at lower or comparable prices than those offered by its parent company, Sandvik AB; (2) Sandvik Steel Company imports from its parent company primarily to obtain sizes and grades which are unavailable from other sources; and (3) Sandvik Steel Company's profitability is attributable to its state-of-the-art cold-working facility, extensive investment in research and development and a large and specialized sales force.

The ITC explained its determination as follows:

In this final investigation, the Commission obtained information confirming that Sandvik [Steel Company] is the exclusive U.S. importer of products from its parent company, thus indicating that the latter may be directing its exports to the United States so as not to compete with its related U.S. producer. In addition, Sandvik [Steel Company] appears to have benefited from the consistently lower prices of Swedish imported products relative to domestic products. Therefore, applying section 771(4)(B) [19 U.S.C. § 1677(4)(B) ], we determine that Sandvik [Steel Company] should be excluded from the domestic industry.

USITC Pub. No. 2033 at 10 (footnotes omitted).

Plaintiffs specifically argue that the data used to support the ITC's statement that Sandvik Steel Company appeared to have benefited from consistently lower prices of Swedish imports concerned welded, not seamless pipe and tube. Defendant ITC correctly points out that the ITC inadvertently quoted material from a paragraph prior to the one beginning on the page cited specifically in the footnote. This earlier paragraph did refer to welded products. However, the ITC's citation to pages A–33 and A–72 of the information obtained in the investigation did cite correctly the data to

support the ITC's statement. *Id.* at A–33, A–72.

Plaintiffs further argue that the ITC did not follow its own factors as set out in previous investigations in order to determine whether "appropriate circumstances" exist to exclude a related party. These factors are "(1) the percentage of domestic production attributable to the related producers; (2) whether related producers chose to import the product under investigation in order to benefit from the unfair market; and (3) the competitive position of the related domestic producer vis-a-vis other domestic producers." *Id.* at 9, n. 23. Plaintiffs claim that the ITC did not make findings as to factors one and two.

The ITC, in its determination, noted a reference in the legislative history to the related parties provision. The Legislative History of the Trade Agreements Act of 1979 provides as follows:

> Thus, for example, where a U.S. producer is related to a foreign exporter and the foreign exporter directs his exports to the United States so as not to compete with his related U.S. producer, this should be a case where the ITC would not consider the related U.S. producer to be a part of the domestic industry.

S.Rep. No. 249, 96th Cong., 1st Sess. 83, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 469.

The above example is the exact scenario of the instant case. Moreover, factor two above would appear to apply to this situation.

Plaintiffs also contend that the ITC should have made findings as to the three factors. The ITC is not required to make such findings and noted in its determination that these three factors were among others it had focused upon in previous investigations. USITC Pub. No. 2033 at 9, n. 23.

This Court holds that the determination by the ITC to exclude Sandvik Steel Company from the domestic industry as a related party was reasonable, supported by substantial evidence on the record and in accordance with law.

## MATERIAL INJURY CAUSED BY LESS THAN FAIR VALUE IMPORTS FROM SWEDEN

In making its determination that the domestic industry was materially injured by reasons of less than fair value imports from Sweden, the ITC considered the volume of imports, the effect of imports on prices in the United States for the like product, and the impact of such imports on the relevant domestic industry, among other factors in accordance with 19 U.S.C. § 1677(7)(B) (1982). The ITC found that

> the significant volume of seamless pipe and tube from Sweden and the high import penetration throughout the period of investigation, combined with the pattern of underselling of these imports and the revenue lost to the domestic industry, demonstrate that these LTFV imports have caused material injury to the domestic industry.

USITC Pub. No. 2033 at 15.

Plaintiffs contend that the ITC's analysis was erroneous for the following reasons: (1) the ITC failed to exclude non-competing imports from its analysis of both import volume and import penetration; (2) the ITC failed to provide substantial analysis for its conclusion that plaintiffs' import volumes and market penetration were "significant"; (3) the ITC ignored evidence in concluding that plaintiffs consistently undersold domestic producers; and (4) there was no substantial evidence of lost sales or lost revenue.

*Import Volume and Import Penetration*

█ Plaintiffs claim that significant volumes of their imports did not compete with domestic products and therefore should have been excluded from the analysis of import volume and import penetration. Defendant ITC argues that the ITC is directed by statute to examine injury to the domestic industry producing the like product, most specifically "the volume of imports of the merchandise which is the subject of the investigation." 19 U.S.C. § 1677(7)(B)(i). Since plaintiffs' merchandise was not excluded from the like product definition, defendant ITC claims this merchandise can

not be excluded from the analysis of import volume and import penetration.

This Court agrees that the ITC does not have the authority to exclude merchandise from the like product designation. *See Sprague Electric Co. v. United States*, 84 Cust.Ct. 260, 261–62, C.R.D. 80–6 (1980) (the "Commission has no authority to refine or modify the class or kind of merchandise found to be, or likely to be, sold at [less than fair value]"). The ITA controls the scope of the investigation, while the ITC determines whether there is material injury or the threat of material injury to the domestic industry producing the like product. 19 U.S.C. §§ 1673, 1673b(a), 1673d. This Court holds that the ITC's determination to include all of the Swedish imports in its analysis of import values was reasonable, supported by substantial evidence on the record and in accordance with law.

◼ Plaintiffs further contend that the ITC only recited the import volumes and market shares when it had a duty to analyze the data to show the impact which the imports had on the domestic industry. Plaintiffs claim that the ITC's recitation of the figures was a defective analysis under the substantial evidence test as discussed in *USX Corp. v. United States*, 11 CIT ——, 655 F.Supp. 487 (1987). Plaintiffs contend that this faulty analysis did not prove that the subject imports were "significant" as required by 19 U.S.C. § 1677(7)(C)(i).

Defendant ITC argues that the figures were analyzed and showed a record level of imports in 1984 (60 per cent higher than the previous year) and an import penetration level of 20.4 per cent in 1984, 15 per cent in 1985 and 17.9 per cent in 1986. USITC Pub. No. 2033 at 13–14, A–52, A–56. Import volume declined .5 per cent from interim 1986 to interim 1987 which the ITC attributed, at least in part, to the instant investigation. *Id.* at 14.

In *USX*, a challenge to a final negative antidumping duty determination, the Court found the ITC's analysis did not meet the substantial evidence test because although the ITC stated that levels of market pen-

etration remained low and stable, the Commission failed to discuss the significance of this trend or its relationship to the other facts resulting from the investigation. *USX*, 11 CIT at ——, 655 F.Supp. at 490. Defendant notes that the instant investigation revealed (along with the import penetration of 15 to 20 per cent) a consistent pattern of underselling, declining prices in the United States market and lost revenues. USITC Pub. No. 2033 at 15. Defendant also distinguishes the instant case from *USX* by noting that the instant case concerns import penetration of 15 to 20 per cent, while *USX* involved import penetration of approximately only one per cent. *Id.* 655 F.Supp. at 489.

This Court agrees that in the instant case, the ITC did not rely on one single factor or "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence" as the Court found in *USX*. *Id.* This Court holds that the ITC's analysis of the impact which import volumes and market shares had on the domestic industry indicated that the volume was significant and that this analysis was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

### Underselling of Domestic Producers

◼ Plaintiffs claim that the ITC relied on seven isolated instances of underselling while ignoring pricing data for products which did not show consistent underselling. These seven instances occurred when lower-priced Sandvik mechanical tubing was purchased instead of a competing domestic product and the purchasers gave plaintiffs' lower prices as one reason, but in most cases not the only reason, for selecting plaintiffs' product. In addition, plaintiffs state that they sometimes undersell domestic products in order to offset the disadvantage they face because of the longer lead time necessitated by shipping from Sweden.

Plaintiffs contend further that there were significant instances of overselling by Sandvik throughout the period of investigation for both hot and cold rolled pipe. Plaintiffs claim that in reality, the investi-

gation revealed a pattern of selling and underselling which the ITC has found in the past not to meet the statutory standard of significant price undercutting. *See Copperweld Corp.*, 12 CIT at ——, 682 F.Supp. at 566.

Defendant ITC and defendant-intervenors cite as evidence of underselling: (1) data on bids for seamless SSHPs; (2) information in purchasers' questionnaires and information on lost sales; and (3) quarterly price comparisons.

The data on bids show that seven of the eleven orders of seamless SSHPs were awarded to plaintiffs and that the price of these seven orders was from eight to fifteen per cent below the quoted domestic price. USITC Pub. No. 2033 at 14–15. Plaintiffs claim the data were not supported by substantial evidence because the products were not representative of the range of products made by them, the purchasers were not representative of all domestic purchasers and only the two largest bids were included in the data. Defendant ITC contends that its record demonstrates that it sought pricing data on a wide range of products, purchasers and imported shipments. ITC C. 17 at A–90. Defendant ITC further notes that it is not required to meet "some ambiguous level of scientific reliability" in compiling its record. *Alberta Pork Producers' Mktg. Bd. v. United States*, 11 CIT ——, 669 F.Supp. 445, 463 (1987).

The purchasing questionnaires and lost sales information indicate that plaintiffs' lower prices was an important factor in purchasers' selections. USITC Pub. No. 2033 at A–71–72, A–80–81. Quarterly price comparisons during January 1984 to June 1987 show that "prices of seamless products 2 and 3 (mechanical tubing) ... generally fell, prices for seamless product 1 (pipe) and seamless product 4 (redraw hollows) initially increased before declining...." USITC Pub. No. 2033 at A–65. Plaintiffs contend that pricing information was not based upon representative sales of Sandvik products in the United States although price comparisons were made with specific products.

The Court notes that the ITC is within its discretion in making a reasonable interpretation of the facts it uncovers in an investigation. *Copperweld*, 682 F.Supp. at 577; *Mirror Mfrs.*, 12 CIT at ——, 696 F.Supp. at 648. This Court holds that the ITC's interpretation of data regarding the underselling of seamless SSHPs was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

*Lost Sales or Lost Revenue*

■ Plaintiffs claim the ITC is unable to confirm any instances of lost sales attributable to lower priced Sandvik products. Defendant-intervenors contend that the bid information noted *supra* was evidence of head-to-head competition between plaintiffs and the domestic industry thus demonstrating lost sales. There was also an unconfirmed allegation of lost sales along with an indication of increased purchases from Sweden. USITC Pub. No. 2033 at A–80.

The ITC verified a specific instance of lost revenue where United States producers cut their prices to compete with the subject merchandise. *Id.* at A–82. In addition, certain purchasers stated that domestic producers had to lower the price of their merchandise to compete with the delivered prices of Swedish pipe and tube. *Id.* at A–80, A–82–83.

This Court holds that the ITC's interpretation of data regarding lost sales or lost revenues was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

### DETERMINATION OF ITA OF SALES AT LESS THAN FAIR VALUE

Plaintiffs contend that the ITA made the following errors when determining that sales of SSHPs from Sweden were made at less than fair value: (1) the ITA erroneously deducted from its calculation of the United States Price in exporter's sales price transactions, part of the profit which Sandvik Steel Company made on its domestic sales of products which it further processed; (2) the ITA failed to match comparable quantities of merchandise sold in the

United States and in the home market (or third country). Where such matches could not be made, the ITA failed to make any adjustment for the effect of quantity on price despite plaintiffs' demonstration of the relationship between quantity and price; and (3) the ITA erroneously calculated the United States price on the basis of sales which plaintiffs made to an unrelated reseller located in a third country. The Court will examine each of these issues in order to determine whether the ITA's determination was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

*Profit Deducted from United States Price*

█ Plaintiffs object to the ITA deducting from the calculation of the United States price part of the profit which Sandvik Steel Company made on its domestic sales of products which were further processed. Plaintiffs argue that deduction of the profit is not consistent with prior ITA practice and therefore should be explained and that the dumping margin would not be eliminated even if plaintiffs were to increase their United States price by the amount of dumping. The ITA stated in its final determination:

> For the exporter's sales price sales involving further manufacturing, we deducted all value added in the United States. This value consisted of all costs associated with the manufacture and sale of the finished pipe or tube, and a proportional amount of the profit or loss related to these costs. Profit or loss was calculated by deducting from the sales price of the finished pipe or tube all costs incurred in Sweden and the U.S. by the company for the production and sale of the product. The profit or loss was then apportioned between the costs of the redraw hollows and additional costs incurred in the U.S. based on the ratio of these costs to total costs.

52 Fed.Reg. at 37,811.

In Comment 7 to the final determination the ITA explained further:

> We calculated the profit/loss of the SSHP finished and sold by Sandvik Steel Company in the U.S. and allocated this profit/loss, based on the cost of production, to the redraw hollow entering the U.S. and the additional costs incurred in the U.S. To consider profit/loss to be outside the definition of "value added" would be contrary to agency policy (See *Erasable Programmable Read Only Memories* (EPROMS) from Japan (51 FR 39680, Oct. 30, 1986). While it is not the Department's practice to deduct an element for profit attributable to the related reseller in circumstances where ESP [exporter's sales price] sales do not involve additional manufacturing in the U.S., the statute does not preclude us from considering profit to be part of value added when additional manufacturing or assembly is performed.

52 Fed.Reg. at 37,813.

The statute referred to above is 19 U.S.C. § 1677a(e)(3) which reads as follows:

> (e) Additional adjustments to exporter's sales price
>
> For purposes of this section, the exporter's sales price shall also be adjusted by being reduced by the amount, if any, of—
>
> \* \* \* \* \* \*
>
> (3) *any* increased value, *including* additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise.

19 U.S.C. § 1677a(e)(3) (1982) (emphasis added).

Along the same lines, 19 C.F.R. § 353.10(e)(3) states:

> (e) *Additional adjustments to exporter's sales price.* For purposes of this section, the exporter's sales price shall also be adjusted by being reduced by the amount, if any, of—
>
> \* \* \* \* \* \*
>
> (3) Any increased value resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not

the exporter of the merchandise, which value *generally* will be determined from the costs of material, labor and other expenses incurred in such manufacture or assembly.

19 C.F.R. § 353.10(e)(3) (1986) (emphasis added).

The Court recently addressed the issue of deduction of profit in *Sonco Steel Tube Div., Ferrum Inc. v. United States,* 12 CIT ——, 694 F.Supp. 959 (1988). In *Sonco,* the Court upheld the ITA's profit deduction, finding that "[t]he plain words of the statute and regulation neither expressly prohibit nor require ITA to consider profit as an element of value added." *Sonco,* 12 CIT at ——, 694 F.Supp. at 966. The Court found "no reason to dispute ITA's statement ... that its treatment of profit associated with value added in the United States was 'based on the Department's current methodology at the time of the final determination....'" *Id.* at 967.

As the ITA noted in its determination in the instant case, it has been their practice to deduct profit. 52 Fed.Reg. at 37,813. As an example of this practice, the ITA cited *Erasable Programmable Read Only Memories (EPROMS) From Japan; Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 39,680 (Oct. 30, 1986), where "the cost of further processing in the United States, including an amount for profit or loss associated with that processing, was ... deducted." 51 Fed.Reg. at 39,681.

In its Study of Antidumping Adjustments Methodology and Recommendations for Statutory Change (Nov.1985) (hereinafter Adjustment Study) the ITA stated that "the purpose of ESP adjustments for value added is to enable ITA to arrive at 'the determination of the appropriate ESP for the merchandise in its condition at the time of importation.'" *Sonco,* 12 CIT at ——, 694 F.Supp. at 967 (citing Adjustment Study at 34–35). The Adjustment Study also cited *Cellular Mobile Telephones and Subassemblies from Japan,* 50 Fed.Reg. 45,447 (Oct. 31, 1985), where the exporter's sales price of selected subassemblies was based on the selling price of the finished telephones with deductions for value added, including general expenses and profit. *Id.* (citing Adjustment Study at 35).

Plaintiffs contend that the ITA had changed its administrative practice beginning with *Cellular Mobile Telephones from Japan,* followed by the Adjustment Study and that this Court should consider whether the ITA's reversal required an explanation of the reasons for that reversal. This particular issue was already decided in *Sonco* where the Court stated:

> Although ITA did reject a specific proposed regulation regarding ESP value added adjustments for profit, it acknowledged the existence of a policy permitting some adjustments, and announced its desire to gain further experience with such adjustments before adopting any specific proposals. While formal rulemaking procedures might be required before the ITA could adopt the specific type of rule which the ITA rejected in 1980, it is not precluded from construing the statute to cover profit as a factor in value added and making ESP adjustments.

12 CIT at ——, 694 F.Supp. at 966–67 (footnotes omitted).[2]

Plaintiffs further contend that the ITA's methodology of deducting profit makes it impossible for an exporter with substantial manufacturing in the United States to eliminate dumping by raising its sales price in the United States by an amount exactly equal to the calculated amount of the dumping. Plaintiffs claim that this price equalization can not take place since as the United States price is increased, the percentage of the profit deduction also in-

**2.** The rule which the ITA rejected in 1980 read in pertinent part:
> If the value of the merchandise as imported into the United States is less than 80 percent of the price at which the merchandise is sold or agreed to be sold in the United States to a party unrelated to the exporter, such in-

creased value shall also include an appropriate allocation of profit to such material or labor used or services performed after importation as was not included in the value of the merchandise imported.

44 Fed.Reg. 59,742, 59,749 (Oct. 16, 1979).

creases, creating a residual dumping margin. In support of their theory, plaintiffs cite *Ansaldo Componenti S.p.A. v. United States*, 10 CIT 28, 35, 628 F.Supp. 198, 204 (1986) where the Court stated: "Under 19 U.S.C. § 1673, if the price for goods in the United States is less than the foreign market value of the goods, the difference between the two is the margin of dumping in the United States and antidumping duties must be paid to offset it."

In *Ansaldo*, the Court simply noted that the margin of dumping is the difference between the foreign market value and the United States price. Defendant-intervenors point out that the ITA's approach to profit deduction is virtually identical to its approach to a variety of other adjustments, such as the adjustment to the United States price for expenses such as tariff duties, commissions, advertising or brokerage and handling fees. Memorandum of Defendant–Intervenors in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record at 86.

This Court holds that the ITA's determination to deduct profit from the calculation of the United States price was reasonable, supported by substantial evidence on the record and in accordance with law.

*Matching Comparable Quantities and Quantity Discount Adjustment*

Plaintiffs contend that the ITA failed to match comparable quantities of merchandise sold in the United States with those sold in Sweden and West Germany. They claim the appropriate quantity distinction should be sales above and below 100 kilograms.

Defendant ITA contends that plaintiffs have confused the adjustment for comparable quantities with the quantity discount adjustment. Defendant ITA claims that plaintiffs never requested ITA to match comparable quantities and that plaintiffs do not qualify for the quantity discount adjustment.

The statute outlining an allowance for differences in quantities sold is section 773(a)(4)(A) of the Tariff Act of 1930, as amended, which states in pertinent part:

(4) Other adjustments

In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to—

(A) the fact that the commercial quantities, in which such or similar merchandise is sold or, in the absence of sales, offered for sale, for exportation to, or in the principal markets of, the United States, as appropriate, in the ordinary course of trade, are less or are greater than the commercial quantities in which such or similar merchandise is sold or, in the absence of sales, offered for sale, in the principal markets of the country of exportation in the ordinary course of trade for home consumption....

\* \* \* \* \* \*

then due allowance shall be made therefor.

19 U.S.C. § 1677b(a)(4)(A) (1982 & Supp. V 1987).

"Due allowance" may be made according to 19 C.F.R. § 353.14 (1986) which reads as follows:

§ 353.14 Differences in quantities.

(a) *In general.* In comparing the United States price with such applicable criteria as sales or offers, on which a determination of foreign market value is to be based, comparisons normally will be made on sales of comparable quantities of the merchandise under consideration. *Further, reasonable allowances will be made for differences in quantities, to the extent that it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences in the quantities sold.* In determining allowances for differences in quantity, consideration will be given, among other things, to the practice of the industry in the country of exportation with respect to affording in the home market (or third

country markets, where sales to third countries are the basis for comparison) discounts for quantity sales which are available to those who purchase in the ordinary course of trade.

(b) *Criteria for allowances.* Allowances for price discounts based on quantitative differences in sales ordinarily will not be made unless:

(1) *Six month rule.* The exporter during the period covered by the antidumping investigation as established under § 353.38 (or during such other period as investigation shows is more representative) had been granting quantity discounts of at least the same magnitude with respect to 20 percent or more of such or similar merchandise sold in the home market (or in third country markets when sales to third countries are the basis for comparison) in the ordinary course of trade; or

(2) *Cost justification.* The exporter can demonstrate that the discounts are warranted on the basis of savings which are specifically attributable to the production of the different quantities involved.

(3) *Use in determining foreign market value.* If the exporter satisfies the conditions in paragraph (b) of this section the price of such or similar merchandise sold at a discount in the home market (or in third country markets when third countries are the basis for comparison) will ordinarily be used as the basis for determining the foreign market value of merchandise for comparison with comparable quantities sold in the United States. If the exporter does not satisfy the conditions in paragraph (b) of this section, any sales of such or similar merchandise in the home market (or in third country markets when third countries are the basis for comparison) which are made at a discount will be used in calculating a weighted average in accordance with § 353.20.

(c) *Price lists.* In determining whether a discount has been given, the existence of a published price list reflecting such a discount will not be controlling. A price list ordinarily will be accepted only if, in the line of trade and market under consideration, the exporter demonstrates that it has adhered to its price list.

19 C.F.R. § 353.14 (1986).

Plaintiffs claim they are entitled to an adjustment to reflect a quantity discount for sales of different quantities in the United States and in Sweden or the United States and a third country market in those cases where sales of comparable quantities did not occur in both markets.

In order to qualify for a quantity discount adjustment, plaintiffs must show price/quantity correlation. In a recent determination the ITA commented as follows:

In our view, the controlling requirement of § 353.14 is that, to be eligible for a quantity-based adjustment, a respondent must demonstrate a clear and direct correlation between price differences and quantities sold or costs incurred. This requirement applies equally to an allowance for quantity differences under the six month rule (§ 353.14(b)(1)) or the cost justification requirement (§ 353.14(b)(2)).

*Final Determination of Sales at Less Than Fair Value: Brass Sheet and Strip From the Netherlands,* 53 Fed.Reg. 23,-431, 23,433 (June 22, 1988).

Defendant ITA contends that plaintiffs did not establish to its satisfaction that plaintiffs adhered to a quantity discount schedule in its negotiated prices. Defendant ITA claims that while quantity may have had some impact upon price, there were other factors which also influenced the negotiated price. It was also noted by defendant ITA that plaintiffs' officials in Germany stated that "no fixed quantity discount policy was in effect during the [period of investigation]." ITA R. 162 at 11. Plaintiffs also failed to establish that the discount was a function of the quantities sold. In Comment 10 to the final determination, the ITA explained:

We have reviewed the respondents [sic] pricing practices and determined that no clear correlation between prices and quantities has been demonstrated.

While internal price lists (which include quantity related prices) are used in setting prices, it is impossible to measure their final impact on the negotiated prices. Furthermore, no cost justification has been provided. Therefore, the claim has been denied.

52 Fed.Reg. at 37,814.

This Court finds that the ITA properly exercised its discretion in determining that plaintiffs do not qualify for a quantity discount adjustment since the record reflects that there is a lack of correlation between price and quantity. The Court holds that the ITA's determination not to make an adjustment for quantity discount was reasonable, supported by substantial evidence on the record and in accordance with law.[3]

*Sales to Middleman in a Third Country*

■ Plaintiffs contend that the ITA erroneously calculated the United States price on the basis of SSHP sales to an unrelated middleman located in a third country rather than on the basis of the middleman's sales to the United States. According to the sales agreement between plaintiffs and the middleman, the middleman would have the right to distribute plaintiffs' merchandise in the United States, the middleman would use best efforts to promote, market, sell and/or distribute the product in the United States and Sandvik would purchase the entire unsold inventory at current list price at the end of the agreement. Plaintiffs claim they had no control over the merchandise after it was sold to the middleman.

Plaintiffs contend that their sales to the middleman should not be considered as sales to the United States for which a dumping margin should be calculated for the following reasons: (1) the statutory criteria authorizing use of the price to a middleman has not been met; (2) the use of the plaintiffs-middleman price for merchandise likely to remain in inventory would result in comparing foreign market values based on Swedish sales which are not contemporaneous with sales to the United States; and (3) the middleman's sales of merchandise to unrelated purchasers in the United States falls within the definition of United States price in the Tariff and Trade Act of 1984.

According to 19 U.S.C. § 1677a(b) purchase price is "the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States." 19 U.S.C. § 1677a(b) (1982 & Supp. V 1987). Legislative history indicates that the above definition of purchase price was modified

> to provide statutory authority for the present administrative practice whereby *if a producer knew that the merchandise was intended for sale to an unrelated purchaser in the United States under terms of sale fixed on or before the date of importation, the producer's sale price to an unrelated middleman will be used as the purchase price.* Thus, the dicta in *Voss International v. United States*, C.D. 4801, [473 F.Supp. 327] (May 7, 1979) is explicitly overruled, and "purchase price" may be used if transactions between related parties indicate that the merchandise has been sold prior to importation to a U.S. buyer unrelated to the producer. The Committee understands that the executive branch intends to issue regulations, consistent with present practice, under which sales from the foreign producer to middlemen and any sales between middlemen before sale to the first unrelated U.S. purchaser are examined to avoid below cost sales by the middlemen.

H.R.Rep. No. 317, 96th Cong., 1st Sess. 75 (1979) (emphasis added).

---

**3.** Plaintiffs appear to be making an argument that they are entitled to a separate adjustment for matching comparable quantities in addition to the quantity discount adjustment outlined in 19 C.F.R. § 353.14(b). Section (a) of the regulation sets down the general instructions for the ITA to compare the usual quantities sold in the United States market with the usual quantities sold in the foreign market. Section (b) entitled "Criteria for allowances," sets out the requirements to be met in order to qualify for the quantity discount. Since plaintiffs did not meet the requirements of section (b), they did not receive a quantity discount.

Plaintiffs contend that although they knew that the merchandise was intended for sale to an unrelated purchaser in the United States, the terms of sale between the middleman and its customers were not "fixed on or before the date of importation." Plaintiffs contend that they did not control the terms and condition of resale and had no knowledge of the terms of sale between the middleman and its United States customers. Plaintiffs' lack of knowledge included ignorance as to whether or not the terms of sale were fixed on or before the date of importation.

Defendant ITA contends that it is accepted policy for the Department to use the sales price between the manufacturer and the middleman as the United States price. The ITA cites to Pattison's treatise on antidumping law which states:

> Perhaps one of the most common questions raised in this regard involves a foreign producer and an unrelated foreign trading company which sells the producer's goods through a U.S. subsidiary trading or marketing company to an unrelated U.S. purchaser. *The Department of Commerce will generally use the sale price between the manufacturer and the independent foreign trading company as the basis for United States Price. So long as that purchase is consummated prior to importation and the manufacturer knows the merchandise is being sold in the United States, that sale price will satisfy the purchase price standards and can be used for the United States price.*

3 J. Pattison, *Antidumping and Countervailing Duty Laws* § 5.04 at 5–19 (1988) (emphasis added, footnote omitted).

In addition, the ITA's Adjustment Study states:

> Purchase price is the price at which the exported merchandise is purchased by the first unrelated buyer when the sale occurs prior to importation into the United States. This usually is the price at which a foreign producer sells merchandise to an unrelated U.S. importer, or to a foreign trading company for export to the U.S.

Adjustment Study at 4.

The fact that plaintiffs have no knowledge as to whether or not the terms of sale between the middleman and its United States customers were fixed on or before the date of importation to the United States has no bearing on whether or not those terms were actually fixed. Plaintiffs provide no evidence to contradict that the terms were fixed. Plaintiffs are grasping on to one phrase in the legislative history in order to oppose a practice that the ITA has followed in its discretion.

This Court holds that the ITA's determination that the statutory requirements for using the middleman's price were met was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

*Foreign Market Value*

■ Plaintiffs introduce foreign market value restrictions into the discussion of the determination of the United States price. Plaintiffs state that foreign market value and United States price must be compared as of the date the merchandise is sold in the United States and since plaintiffs' merchandise is likely to be in inventory, there will not be a contemporaneous comparison.

The United States price in this case is the purchase price which is defined as "the price at which the merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States." 19 U.S.C. § 1677a(b). The sales by plaintiffs to the middleman are not exporter's sales price transactions since these sales were made before the merchandise was imported into the United States and the middleman was an unrelated importer. 19 U.S.C. § 1677a(c).

The requirement that foreign market value prices must be the price as of the date of actual entry of the merchandise into the United States applies to exporter's sales price transactions. The statute refers to the determination of foreign market value regarding sales by the "person for whom

(or for whose account) the merchandise is imported to any other person who is not described in subsection (e)(3) of this section...." 19 U.S.C. § 1677b(a)(1) (1982 & Supp. V 1987). Subsection (e)(3) defines related parties. 19 U.S.C. § 1677b(e)(3) (1982). This restriction applies to the price charged by the United States importer to the first unrelated United States purchaser, which would be the exporter's sales price.

This Court holds that the ITA's determination of the United States Price was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

*Reseller*

 Plaintiffs argue that the middleman qualifies as a reseller under the amended definition of United States price in the Trade and Tariff Act of 1984. Therefore, plaintiffs contend that the price charged by the middleman, not the price which plaintiffs charged to the middleman should comprise the United States price.

Defendant ITA points out that Commerce has interpreted the term reseller in 19 U.S.C. § 1677a(b) to mean a foreign exporter who resells as opposed to one who merely ships the merchandise, and one whose sales are used to calculate the foreign market value. Defendant ITA cites to Proposed Rule and Request for Comments 19 C.F.R. Part 353 where the Department stated:

> Paragraph (s) of the proposed rule defines for the first time the word "reseller." The definition is consistent with section 614 of the 1984 Act. Use of the word "reseller" rather than "exporter" in the proposed rule focuses attention on selling activity, which is important in calculating foreign market value, rather than on shipping activity, which is not.

51 Fed.Reg. 29,046, 29,047 (Aug. 13, 1986).

Legislative history indicates that the statute was amended "so a reseller's price *may* serve as purchase price if it is prior to the date of importation and the merchandise is for exportation to the United States." H.Conf.Rep. No. 1156, 98th Cong., 2d Sess., 185 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5220, 5302 (emphasis added).

The ITA explained its decision regarding the inclusion of these sales within the calculation of the United States price in its response to Comment 8 of the final determination:

> We normally treat sales by a respondent to an unrelated purchaser as sales to the United States where the seller knows that the merchandise is being sold for export to the United States. This is true of sales to trading companies in the country of origin or those in third country locations. *Urea from the USSR* (52 FR 19560, May 26, 1987), *Fuel Ethanol from Brazil* (51 FR 5573, February 14, 1986). Therefore, since Sandvik knew that the merchandise was being sold to the U.S., we included these sales in our analysis.

52 Fed.Reg. at 37,813.

This Court holds that the ITA acted within its discretion in using the price charged by plaintiffs to the middlemen as the United States price and that this determination was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

### CONCLUSION

The Court holds that based on the aforementioned reasons, the determinations by the ITC and the ITA were reasonable, supported by substantial evidence on the record and otherwise in accordance with law. Accordingly, the determinations are affirmed, plaintiffs' motion for judgment upon the agency record is denied and this action is dismissed.