**PEER BEARING COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant,**

**The Torrington Company; Federal–Mogul Corporation, Defendant–Intervenors.**

No. 91–08–00580.

United States Court of International Trade.

Sept. 4, 1992.

Venable, Baetjer, Howard & Civiletti, John M. Gurley, John C. Dibble and Lindsay B. Meyer, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Velta A. Melnbrencis, of counsel, Stephen J. Claeys, Atty.–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Geert De Prest, John M. Breen, Vincent J. Branson, Patrick J. McDonough and Amy S. Dwyer, for defendant-intervenor The Torrington Co.

Frederick L. Ikenson, P.C., Frederick L. Ikenson, J. Eric Nissley, Larry Hampel and Joseph A. Perna, V, for defendant-intervenor Federal–Mogul Corp.

## OPINION

TSOUCALAS, Judge:

Plaintiff, Peer Bearing Company ("Peer"), moves pursuant to Rule 56.1 of the Rules of this Court for judgment on the agency record challenging the Department of Commerce, International Trade Administration's ("ITA") decision not to calculate a separate antidumping duty margin for Peer International, a Japanese firm which buys and sells but does not produce ball bearings, by using constructed value data provided by Peer International to calculate foreign market value ("FMV") and to use Peer International's sales to U.S. importers to calculate United States price ("USP"). In the alternative, Peer requests that on remand the ITA be required to use constructed value data provided by Peer International, or other less adverse information, in cases where the ITA used "best information available" ("BIA") in calculating the margins for Peer International's Japanese suppliers ("the Japanese suppliers"). Plaintiff also challenges the ITA's use of BIA in situations where the Japanese suppliers allegedly failed to provide home market or constructed value data due to the bearings not having been produced or shipped at the time the Japanese suppliers

submitted their questionnaire responses. Finally, plaintiff requests this Court to order the ITA to calculate plaintiff's importer-specific assessment rate now.

The administrative determination under review is the ITA's final results in *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Final Results of Antidumping Duty Administrative Reviews ("Final Results")*, 56 Fed.Reg. 31,754 (1991). Substantive issues raised by Peer and Peer International in the underlying administrative proceeding were addressed by the ITA in the issues appendix to *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany; Final Results of Antidumping Duty Administrative Review ("Issues Appendix")*, 56 Fed. Reg. 31,692 (1991).

### Background

On June 11, 1990, the ITA initiated an administrative review of ball bearings, cylindrical roller bearings, spherical plain bearings and parts thereof from Japan. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom Initiation of Antidumping Administrative Reviews*, 55 Fed.Reg. 23,575 (1990). Peer and Peer International participated in this review. Administrative Record Japan Public ("AR Jap.Pub.") Docs. 28, 63.

On March 15, 1991, the ITA published its preliminary determination in the administrative review. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts thereof from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Antidumping Duty Administrative Reviews ("Preliminary Results")*, 56 Fed.Reg. 11,186 (1991). In the Preliminary Results, the ITA calculated a company-specific antidumping duty margin for Peer International which was 0.08%. *Preliminary Results*, 56 Fed.Reg. at 11,189.

On July 11, 1991, the ITA published its Final Results in this proceeding. *Final Results*, 56 Fed.Reg. 31,754. ITA found "that all of Peer [International's] suppliers had knowledge at the time they sold their merchandise to Peer [International] that those sales were destined for the United States," that the ITA "considers [the suppliers] the source of any dumping activity" and "[t]herefore, for cash deposit purposes, the [ITA] has not calculated a rate for Peer [International]." *Issues Appendix*, 56 Fed. Reg. at 31,747.

In addition, in instances where the Japanese suppliers failed to provide requested information to the ITA, the ITA resorted to the use of BIA. *Final Results*, 56 Fed. Reg. at 31,755; *Issues Appendix*, 56 Fed. Reg. at 31,705, 31,747–48.

### Discussion

The Court's jurisdiction over this matter is derived from 28 U.S.C. § 1581(c) (1988).

 A final determination by the ITA in an administrative proceeding will be sustained unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Con-*

*solidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States*, 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

1. Company Specific Margin for Peer International

 Peer argues that Peer International is a reseller of ball bearings, citing 19 C.F.R. § 353.3(s) (1991) for support, and that as such Peer International has a right to a separate antidumping duty margin based on Peer International's sales to U.S. importers. *Memorandum of Points and Authorities in Support of Plaintiff's Motion for Judgment on the Agency Record ("Peer's Memorandum")* at 12–27. Peer argues that since Peer International had no home market sales upon which to base FMV, the ITA should have used constructed value data provided by Peer International to calculate FMV.[1] This information consisted of Peer International's cost of acquiring the bearings from its Japanese suppliers and Peer International's selling, general and administrative expenses and profit. *Peer's Memorandum* at 16–21. Also, Peer argues that USP should be based on Peer International's sales to Peer or, in the alternative, that the ITA should treat Peer International's sales to Peer as

1. In an administrative review, the ITA is required to calculate "the [FMV] and [USP] of each entry of merchandise subject to [an] antidumping duty order" and determine "the amount, if any, by which the [FMV] of each such entry exceeds the [USP] of the entry." 19 U.S.C. § 1675(a)(2) (1988).

19 U.S.C. § 1677b(a) (1988) defines FMV:

**(1) In general**

The foreign market value of imported merchandise shall be the price, ...

(A) at which such or similar merchandise is sold ... in the principal markets of the country from which exported ..., or

(B) if not sold or offered for sale for home consumption, ... then the price at which so sold or offered for sale for exportation to countries other than the United States,

....

**(2) Use of constructed value**

If the administering authority determines that the foreign market value of imported merchandise cannot be determined under paragraph (1)(A), then, notwithstanding paragraph (1)(B), the foreign market value of the merchandise

may be the constructed value of that merchandise, as determined under subsection (e) of this section.

"Constructed value" is defined at 19 U.S.C. § 1677b(e) (1988):

**(e) Constructed value**

**(1) Determination**

For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of—

(A) the cost of materials ... and of fabrication or other processing of any kind employed in producing such or similar merchandise ...;

(B) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation ..., except that—

(i) the amount for general expenses shall not be less than 10 percent of the cost as defined in subparagraph (A), and

(ii) the amount for profit shall not be less than 8 percent of the sum of such general expenses and cost....

exporter sales price ("ESP") sales for purposes of determining USP.[2] *Id.* at 22–24.

Defendant and defendant-intervenors, Federal–Mogul Corporation ("Federal–Mogul") and The Torrington Company ("Torrington"), claim that there is specific statutory authority which allows the ITA to base FMV on home market sales by Peer International's suppliers and to base USP on sales made by the suppliers to Peer International for exportation to the United States. *Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment upon the Administrative Record* at 14–15; *Federal–Mogul Corporation's Opposition to Plaintiff's Motion for Judgment on the Agency Record* at 1–2; *The Torrington Company's Response to Plaintiff's Rule 56.1 Motion for Judgment on the Agency Record* at 6.

### A. Peer International as a Reseller

In arguing that Peer International is a reseller, Peer relies on 19 C.F.R. § 353.3(s) which states " '[r]eseller' means any person (other that the producer) *whose sales the Secretary uses to calculate foreign market value or U.S. price,* including the for-

eign reseller or exporter." (Emphasis added). The plain language of this regulation is of no help to Peer because it grants the Secretary broad discretion in deciding when an interested party is a "reseller." While it is true that Peer International resells bearings, it is not a "reseller" within the meaning of 19 C.F.R. § 353.3(s) if, as here, the Secretary chooses not to use Peer International's sales as a basis for calculating USP or FMV. Indeed, the ITA could not use home market sales by Peer International to calculate FMV because Peer International made no such sales. Therefore, the Court finds that Peer International does not deserve a company specific antidumping duty margin solely on the basis that it is a reseller of ball bearings.

### B. United States Price

The use of ESP to calculate USP only occurs when sales are between related parties. 19 U.S.C. § 1677a(c).[3] Since Peer concedes that Peer and Peer International are not related parties, ESP cannot be used to calculate USP. *Peer's Memorandum* at 12.

---

**2.** Purchase price and ESP are the two types of USP. USP, purchase price and ESP are defined at 19 U.S.C. § 1677a (1988):

> **(a) United States price**
> [T]he term "United States price" means the purchase price, or the exporter's sales price, of the merchandise, whichever is appropriate.
> **(b) Purchase price**
> "[P]urchase price" means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States.
> **(c) Exporter's sales price**
> "[E]xporter's sales price" means the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter.... The purchase price is normally used as USP where the transaction prior to importation is between unrelated parties, or at arm's length. The exporter's sales price will be used as the USP when the U.S. importer and the foreign seller are "related parties." *See* 19 U.S.C. § 1677(13) (1988). The exporter's sales price will be the price at which the merchandise is first sold to an unrelated purchaser in the United States. 19 U.S.C. § 1677a(c).

**3.** The clearest definition of "related parties" is at 19 U.S.C. § 1677(13):

> (13) Exporter
> For the purpose of determining United States price, the term "exporter" includes the person by whom or for whose account the merchandise is imported into the United States if—
> (A) such person is the agent or principal of the exporter, manufacturer, or producer;
> (B) such person owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in the business of the exporter, manufacturer, or producer;
> (C) the exporter, manufacturer, or producer owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in any business conducted by such person; or
> (D) any person or persons, jointly or severally, directly or indirectly, through stock ownership or control or otherwise, own or control in the aggregate 20 percent or more of the voting power or control in the business carried on by the person by whom or for whose account the merchandise is imported into the United States, and also 20 percent or more of such power or control in the business of the exporter, manufacturer, or producer.
> *See also* 19 C.F.R. § 353.45 (1991).

Therefore, USP must be calculated based on "purchase price" which is defined as the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States.

19 U.S.C. § 1677a(b). In this case Peer International purchased the bearings at issue from a "manufacturer or producer" in Japan, "prior to the date of importation ... for exportation to the United States." *Id.* Moreover, the ITA determined that the producers, at the time they sold the merchandise to Peer International, had knowledge that the sales were "for exportation to the United States." [4] In these circumstances the ITA has consistently used the suppliers' sales to the middleman to calculate USP.[5]

This Court, in *Sandvik AB v. United States,* 13 CIT 738, 721 F.Supp. 1322, *aff'd,* 904 F.2d 46 (Fed.Cir.1989), affirmed the ITA's use of a supplier's sales to a middleman to calculate USP in a case similar to this one. The plaintiffs in *Sandvik* argued that the price charged on sales to the U.S. by a third country exporter, instead of the price the producers charged to the third country exporter, should be used to calculate USP. *Sandvik,* 13 CIT at 761, 721 F.Supp. at 1341. The Court in *Sandvik* held that the ITA acted within its discretion in using the price charged by the producers to the middleman to calculate USP. *Id.* at 762, 721 F.Supp. at 1341.

Thus, the Court concludes that ITA's use of the Japanese suppliers' sales to Peer International as the "purchase price" to calculate USP complied with the statute.

**C. Foreign Market Value**

▆▆▆ Peer asserts that the ITA should have used constructed value data provided by Peer International to calculate FMV. *Peer's Memorandum* at 16. As noted above, FMV is

the price, at the time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person ...

(A) at which such or similar merchandise is sold ... in the principal markets of the country from which exported....

19 U.S.C. § 1677b(a)(1)(A).

Such or similar merchandise is defined as

merchandise in the *first* of the following categories in respect of which a determination ... can satisfactorily be made:

(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was *produced in the same country by the same person* as, that merchandise.

19 U.S.C. § 1677(16) (1988) (emphasis added). ITA is first required to calculate FMV by examining merchandise produced by the same person in the same country who produced the merchandise which is under review. Peer International's suppliers produced the merchandise under review. Therefore, the ITA was correct in calculating FMV on the basis of the Japanese suppliers' sales of bearings in the home market and not on the basis of constructed value data provided by Peer International.

---

**4.** Peer International conceded that the ITA properly determined that the Japanese suppliers had knowledge at the time they sold their merchandise to Peer International that those sales were destined for the United States. AR Jap.Pub.Doc. 361.

**5.** *See, e.g., Electrolytic Manganese Dioxide From Japan; Preliminary Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 24,462, 24,-463 (1992); *Television Receivers, Monochrome and Color, From Japan; Preliminary Results of Antidumping Duty Administrative Review,* 56

Fed.Reg. 64,751, 64,751–52 (1991); *Natural Bristle Paint Brushes and Brush Heads From the People's Republic of China; Final Results of Antidumping Duty Administrative Review,* 55 Fed. Reg. 42,599, 42,599–600 (1990); *Final Determination of Sales at Less Than Fair Value: Certain Small Business Telephone Systems and Subassemblies Thereof From Korea,* 54 Fed.Reg. 53,-141, 53,147–48 (1989); *Antidumping; Final Determination of Sales at Not Less Than Fair Value; Certain Forged Steel Crankshafts From Japan,* 52 Fed.Reg. 36,984 (1987).

### 2. *Best Information Available*

■ Peer states that Peer and Peer International complied with all information requests made by the ITA during this review. Therefore, Peer argues that the ITA's use of BIA in calculating dumping margins for the Japanese suppliers, in instances where those suppliers failed to provide the ITA with requested information, was unfair to Peer and Peer International and not in accordance with law. *Peer's Memorandum* at 27–31.

19 U.S.C. § 1677e(c) (1988) provides that:

In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

*See also* 19 C.F.R. § 353.37 (1991).

In its Final Results, the ITA explained its use of BIA when respondents failed to provide FMV data in this review stating:

1. If a firm failed to provide matching data for an insignificant portion by quantity of its reported U.S. sales, we used as BIA for those particular transactions the higher of (1) the firm's previous rate from the [less than fair value] investigation (or, if the firm did not have an individual rate, the "all others" rate), or (2) the weighted-average margin for that firm from this review;

2. If a firm failed to provide matching data for a significant portion of its reported U.S. sales by quantity, we used as BIA for those particular transactions the higher of (1) the firm's previous rate (or "all others" rate) from the [less than fair value] investigation, or (2) the highest calculated rate for any firm in this review.

*Issues Appendix*, 56 Fed.Reg. at 31,705. For the Japanese suppliers, the ITA found that a significant amount of matching data was not provided, so the ITA used the all others rate from the less than fair value investigation which was 45.83%. *Final Results*, 56 Fed.Reg. at 31,756.

Peer admits that its Japanese suppliers did not submit some information requested by the ITA. *Reply Brief of Peer Bearing Company* at 8–9.

The Court finds that the ITA's use of BIA in instances where the Japanese suppliers failed to provide requested information was supported by substantial evidence on the administrative record and in accordance with law. The fact that Peer and Peer International complied fully with the ITA's information requests but were still indirectly subjected to the use of adverse BIA is solely a result of their decision to purchase bearings from companies subject to an antidumping duty order. This is precisely the way the statute is supposed to work.

Peer also argues that, in some instances where the Japanese suppliers did not supply requested constructed value data, the data did not exist when the suppliers presented their questionnaire responses to the ITA because the bearings had not yet been produced. *Peer's Memorandum* at 31–34.

This argument does not hold up. ITA requested the submission of constructed value data covering the period of November 1, 1988 through April 30, 1990. AR General Pub.Doc. 3. One of the Japanese suppliers only provided information covering the period October 1988 to September 1989. AR Jap.Pub.Doc. 820. While it is possible that some of the information requested by the ITA did not exist when the Japanese supplier responded to the ITA's information requests, the supplier did nothing to address this failure to provide all the requested information. The supplier could have suggested the use of historical data, or provided supplemental information pursuant to 19 C.F.R. § 353.31(a)(2) (1991).

The suppliers' constructed value questionnaire responses were due October 18, 1990. *See, e.g.*, AR Jap.Pub.Doc. 365. By that time the supplier at issue should have had available additional data on constructed value for some of the bearings produced between September 1989 and April 1990. The supplier did nothing to supplement its earlier inadequate questionnaire response.

Therefore, the Court finds that the ITA's use of BIA for the missing constructed value data was supported by substantial evidence on the administrative record and in accordance with law.

3. *Peer's Request for an Importer-specific Assessment Rate*

█ Peer requests the Court to order the ITA to provide Peer with an importer-specific assessment rate now.

On the subject of the assessment and liquidation of all entries of bearings subject to this review, the ITA stated:

1. Purchase Price Sales

With respect to purchase price sales for these final results, we will divide the total potential uncollected dumping duties ("PUDD"—calculated as the difference between foreign market value and U.S. price) for each importer by the total number of units sold to that importer. We will direct Customs to assess the resulting unit dollar amount against each unit of subject merchandise in each of that importer's entries under the relevant order during the review period.

*Issues Appendix,* 56 Fed.Reg. at 31,698. Following this methodology will give Peer the importer-specific rate it desires.

Currently, the liquidation of all of Peer's entries covered by this review is enjoined as a result of a preliminary injunction issued in *Federal–Mogul Corp. v. United States,* 788 F.Supp. 1225 (C.I.T.1992). There is no reason to believe that the ITA will not provide Peer with an importer-specific rate when all bearings subject to the injunction in *Federal–Mogul* are liquidated pursuant to a final decision in that case.

Peer's request for an order requiring the ITA to provide Peer with an importer-specific margin now is both premature and presents no case or controversy which is a prerequisite for jurisdiction in this Court. *See North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).

### Conclusion

ITA's use of the Japanese suppliers' sales to Peer International to calculate USP and the use of the Japanese suppliers' home market sales to calculate FMV was supported by substantial evidence on the administrative record and was in accordance with law. The ITA's use and choice of BIA when these Japanese suppliers failed to provide requested information was also supported by substantial evidence on the administrative record and in accordance with law. Peer's request for an order requiring the ITA to calculate Peer's importer-specific assessment rate now presents no case or controversy and is also premature.