**PUBLIC VERSION**

YUE PAK, LTD., HE-RO CHEMICALS, LTD., PLAINTIFFS *v.* U.S. INTERNATIONAL TRADE ADMINISTRATION, DEFENDANT, AND CARUS CHEMICAL CO., DEFENDANT-INTERVENOR

Court No. 94–06–00364

(Decided April 18, 1996)

*Ross & Hardies (Steven P. Kersner, Jeffrey S. Neely,* and *Roger Banks)* for plaintiffs.

*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, *(Patricia L. Petty);* of counsel: *Linda S. Chang,* Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

*Winston & Strawn (Edward F. Gerwin, Eric L. Hirschhorn,* and *Karen L. Grubber)* for defendant-intervenor.

## OPINION

MUSGRAVE, *Judge:* Plaintiffs challenge the final results of the review of the United States Department of Commerce, International Trade Administration ("Commerce" or "ITA") in *Potassium Permanganate From the People's Republic of China; Final Results of Antidumping Duty Administrative Review,* Inv. No. A–570–001, *("Final Results"),* an administrative review of an antidumping duty order covering the period of January 1, 1990 to December 31, 1990, as published in the Federal Register. 59 Fed. Reg. 26625 (May 23, 1994). The Court has jurisdiction over this matter pursuant to 28 U.S.C. 1581(c) (1994).

## BACKGROUND

Commerce issued an antidumping order on potassium permanganate ("KMnO₄") from the People's Republic of China ("PRC") on January 31, 1984. On February 1991, the ITA initiated an administrative review of the antidumping order for the period January 1, 1990 to December 31, 1990. Commerce initiated review of 54 firms from the PRC and Hong Kong, notice of which was published in the Federal Register. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed. Reg. 6621 (Feb. 19, 1991) *("Initiation").* The number of firms reviewed was eventually reduced to 47, to include 15 PRC exporters and manufacturers, and 32 Hong Kong resellers. Plaintiffs were among the firms listed in the *Initiation.* Questionnaires were sent to each of the manufacturers, exporters, and resellers listed in the *Initiation.* Questionnaires were not sent to Yue Pak's PRC suppliers, He-Ro's PRC producer, or the particular branch of the PRC trading company used by

He-Ro. Defendant's Memorandum in Opposition to Plaintiffs' Motion For Judgment Upon the Agency Record ("Def.'s Br."), at 5. However, these particular parties did not seek to voluntarily participate in the review. Both Plaintiffs submitted responses to Commerce's questionnaires.

On December 30, 1993, the ITA published the preliminary results of the administrative review in which it preliminarily imposed a country-wide dumping margin of 128.94 percent. *Potassium Permanganate From the People's Republic of China; Preliminary Results of Antidumping Duty Administrative Review,* Inv. No. A–570–001, 58 Fed. Reg. 69330 (Dec. 30, 1993) *"(Preliminary Results").* Three of the 15 PRC exporting and manufacturing firms listed in the Initiation responded to Commerce's questionnaires, including Zunyi Chemical Factory ("Zunyi"), the only producer to respond. *Id.,* 58 Fed. Reg. at 69330–31. Commerce preliminarily determined that the respondents had not demonstrated their independence from the state controlled economy and therefore preliminarily determined that a single, country-wide rate applied to all PRC producers and shippers. *Id.* at 69331. Commerce further preliminarily determined that it would apply best information available ("BIA") due to the lack of cooperation of not only the respondents, but the PRC government as well. *Id.* at 69330–31. Accordingly, Commerce assigned a dumping margin and deposit rate of 128.94 percent, the highest rate established in the 1989 administrative review. *Id.* at 69331. The Hong Kong resellers also received the same rate because, according to Commerce, they did not demonstrate an entitlement to separate rates as intermediate country resellers. *Id.*

Plaintiffs and other respondents requested a hearing which was held on February 10, 1994. *Final Results,* 59 Fed. Reg. at 26626. In their pre-hearing and rebuttal briefs, Plaintiffs objected to Commerce's use of BIA and included information which they urged Commerce to use in lieu of BIA. Plaintiffs' 56.1 Motion for Judgment Upon Agency Record ("Pl.s' Br."), Exh. B, at 9–15. Commerce rejected certain portions of Plaintiffs' briefs because it claimed those portions contained factual information which was untimely provided. Def.'s Br. at 56–57. Plaintiffs claim Commerce then reinstated some of the previously deleted information, but then deleted other information from consideration in its determination. Pl.s' Br. at 8.

In the *Final Results,* Commerce concluded that the PRC respondents had not overcome the presumption of state control and were therefore not entitled to separate rates. *Final Results,* 59 Fed. Reg. at 26627. Commerce also concluded that the Hong Kong resellers were not entitled to separate rates as intermediate country resellers because the PRC trading companies from which the resellers purchased the $KMnO_4$ knew or should have known that merchandise was being exported to the United States. *Id.* at 26628–29. Commerce therefore assigned a single, country-wide rate of 128.94 percent to all producers, shippers and resellers based

upon BIA. *Id.* at 26629–30. That BIA rate was the rate established in the 1989 administrative review. *Id.* at 26629.

### STANDARD OF REVIEW

In reviewing a final determination of Commerce, the Court must uphold that determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a (b) (1) (B). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 619–20 (1966). Moreover, the Court may "not displace the [ITA's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera v. NLRB,* 340 U.S. at 488. However, it is not sufficient to examine only the evidence that allegedly sustains the agency's conclusion. "The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." *Id.* The decisions of Commerce are presumed to be correct. Plaintiffs bear the burden of proving otherwise. 28 U.S.C. § 2639 (a) (1). Thus, Plaintiffs bear the burden of persuading the Court that Commerce's determination is unsupported by substantial evidence.

In reviewing Commerce's interpretation of the antidumping statute, the Court first asks

> whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43 (1984) (footnotes omitted). The Court then reviews Commerce's interpretation to determine whether it is reasonable in light of the language, policies, and enactment history of the statute. *Id.* at 859–866. *See also Corning Glass Works v. United States Int'l Trade Comm'n,* 799 F.2d 1559, 1565 (Fed. Cir. 1986). Thus, considerable weight is accorded Commerce's interpretation of a statute. *See, e.g., Daewoo Electronics Co., Ltd. v. United States,* 6 F.3d 1511, 1516 (Fed. Cir. 1993) (citing *Chevron*

*U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844 (1984)), *cert. denied,* 114 S.Ct. 2672 (Jun. 13, 1994).

## DISCUSSION

Dumping margins are determined by comparing United States price ("USP") to foreign market value ("FMV"). 19 U.S.C. § 1675 (a) (2). Plaintiffs argue that Commerce should have used their prices to their U.S. customers in determining USP. Pl.s' Br. at 9. They also argue that they qualify as intermediate country resellers and that FMV should be based on their prices to third country customers. *Id.* Thus, Plaintiffs argue that they are entitled to a dumping rate based upon their suggested comparison, not one using BIA. *Id.*

### I. *United States Price:*

USP is usually determined by "purchase price," which is defined as follows:

> the term "purchase price" means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States.

19 U.S.C. § 1677a (b) (1988). Commerce interprets the phrase "for exportation to the United States" to mean that the reseller or manufacturer from whom the merchandise was purchased knew or should have known at the time of the sale that the merchandise was being exported for the United States. *See Peer Bearing Co. v. U.S.,* 16 CIT 799, 803–804, 800 F. Supp. 959, 964 (1992). Commerce accordingly bases USP on the purchase price at that given point in the chain of distribution. This interpretation has been upheld by the Court. *Id.,* (citing *Sandvik AB v. United States,* 13 CIT 738, 721 F. Supp. 1322, *aff'd,* 904 F.2d 46 (Fed. Cir. 1990)).

Plaintiffs contend that Commerce's conclusions that their PRC suppliers knew or should have known of the United States destination of the merchandise are not supported by substantial evidence. Pl.s' Br. at 10–19. Plaintiffs argue that they were the first sellers in the chain of distribution to know that the merchandise they sold was destined for the United States, and are therefore entitled to separate dumping margins under Commerce practice, based upon the price at which they sold the merchandise to their U.S. customers. *Id.*

Commerce argues that Plaintiffs' suppliers did know, or should have known, at the time of the sale, that the United States was the ultimate destination of the merchandise purchased. Def.'s Br. at 13–30. Commerce therefore argues that USP is properly based on the sales of those suppliers. *Id.*

### A. *He-Ro:*

As to Plaintiff He-Ro, the record reveals the following: He-Ro received $KMnO_4$ orders from its U.S. customers. Admin. R., Pub. Doc. No. 113,

Fi. 22, Frs. 1–2.[1] Certain of these orders included specific labeling instructions, which included United States Department of Transportation ("DOT") specifications and Occupational Safety and Health Administration ("OSHA") requirements. *Id.* at Exh. 1, Frs. 12, 14; and at Exh. 2., Frs. 31, 37–38, 40–42, 46–47. During the review period, He-Ro also sold merchandise to customers in Brazil, Egypt, and the Netherlands. Admin. R., Con. Doc. No. 6 at Exhs. 2 and 3, Fi. 34, Frs. 28–35. A majority of He-Ro's sales during the review period ([ ] percent), were to the United States. Admin. R., Con. Doc. No. 6, Fi. 34, Fr. 11. Once He-Ro received an order, it contacted China National Chemicals Import and Export Corporation ("Sinochem") and negotiated the purchase of the exact amount needed to fill the order. Admin. R., Pub. Doc. No. 113, Fi. 22, Fr. 2; Con. Doc. No. 6, Fi. 34, Fr. 8. He-Ro purchased at least a portion of its $KMnO_4$ from the [ ] branch of Sinochem, which Sinochem claims is not related to certain other Sinochem branches. Admin. R., Pub. Doc. No. 59, Fi. 14, Fr. 82; Con. Doc. No. 17, Fi. 41, Frs. 15–16. The manufacturer, [ ], Admin. R., Con. Doc. No. 6, Fi. 34, Fr. 8, then packed and blocked the $KMnO_4$ in a full container load, sealed it and made it ready for ocean shipment. Admin. R., Pub. Doc. No. 113, Fi. 22, Frs. 2, 7. He-Ro stated in its questionnaire response that the packing and labeling were identical for both its U.S. and its third country shipments. Admin. R., Pub. Doc. No. 113, Fi. 22, Fr. 7. A freight forwarder then delivered the merchandise directly to the dock in Hong Kong for loading onto the vessel. Admin. R., Pub. Doc. No. 113, Fi. 22, Fr. 3. He-Ro paid its PRC supplier for its United States sales in U.S. dollars. *Id.*, Fi. 22, Fr. 7.

He-Ro stated in its questionnaire response that the PRC manufacturer and import-export company did not know or have reason to know of the ultimate destination of the merchandise. Admin. R., Pub. Doc. No. 38, Fi. 10, Frs. 55–56. Sinochem stated in its response that its Shandong branch was aware that it was selling to a U.S. customer, although it was unaware of the ultimate destination. Admin. R., Pub. Doc. No. 30, Fi. 9, Fr. 6. Sinochem's questionnaire response indicates that the destination of merchandise was New Orleans. *Id.* Zunyi, a respondent producer which sold $KMnO_4$ through Guizhou Provincial Chemicals Import and Export Corporation ("Guizhou"), and Guilin Regional Import and Export Company ("Guilin"), stated that it asked about and received, from these trading companies, information concerning the destination of the merchandise when it received its orders. Admin. R., Con. Doc. No. 11, Fi. 38, Frs. 4, 7.

To supports its position, Commerce points to the specific labeling instructions requested by each customer regarding DOT and OSHA requirements. Def.'s Br. at 25–26. Commerce argues that U.S. dollar purchases suggest a U.S. destination. Def.'s Br. at 26. Commerce also points to a statement by Sinochem that its Shandong branch was aware

---

[1] Citations to the Administrative Record are given as either "Admin. R., Pub. Doc. No. ___," for the public version of the record, and "Admin. R., Con. Doc. No. ___," for the confidential version of the record. "Fi. ___," and "Fr. ___," refer to fiche and frame, respectively.

that it was selling to a U.S. customer, although unaware of the ultimate destination. Id. at 26–27. Commerce argues that producer Zunyi's knowledge of the U.S. destination of the merchandise it sold is indicative of a pattern of knowledge within the industry. Def.'s Br. at 28. Commerce argues that all of Sinochem's branches are considered related, and that Sinochem has not demonstrated otherwise. Def.'s Br. at 27.

Plaintiff He-Ro counters that Sinochem specifically stated in its response, that Shandong branch was not aware of the ultimate destination. Pl.s' Br. at 16–17; Plaintiffs' Reply Brief ("Pl.s' Repl. Br."), at 12–13. Furthermore, He-Ro argues that Commerce did not investigate the [ ] branch or the producers listed by He-Ro in its response, even though Commerce had the obligation to do so. Pl.s' Repl. Br. at 8–9. Thus He-Ro asserts that Commerce's conclusions about He-Ro's supplier's knowledge are based purely on speculation, and are not supported by the record. Id. He-Ro therefore argues that a remand is necessary so that Commerce may question its producers and suppliers to determine whether they knew or should have known of the U.S. destination of the KMnO$_4$ sold by He-Ro. Id. at 23.

The record contains evidence adequate to support Commerce's conclusion that He-Ro's suppliers knew of the U.S. destination of the merchandise during the given review period. The Court finds that the special order purchase practices used by He-Ro and the specific labeling instructions relaying DOT and OSHA requirements indicate that the manufacturer and its trading company knew or should have known of the U.S. destination of the merchandise sold to He-Ro. Moreover, where [ ] percent of all orders are destined for U.S., the fact that the remaining [ ] percent of merchandise destined for third countries is packed and labeled the same does not significantly detract from the weight of the evidence in support of Commerce's conclusion. Commerce's presumption that the various Sinochem branches are related has not been overcome by evidence on the record. Thus, the Court finds that the statement by the Shandong branch of Sinochem that it knew that it shipped to a U.S. customer but was unaware of the ultimate destination also supports Commerce's conclusion that Sinochem knew or should have known of the U.S. destination of the exported KMnO$_4$.

He-Ro's argument that Shandong did not know of the ultimate destination does not significantly detract from the weight of the evidence in support of Commerce's conclusion. Similarly, He-Ro's statements in its questionnaire response that the PRC manufacturer and import-export company did not know or have reason to know of the ultimate destination of the merchandise does not significantly detract from the adequacy of the evidence of the labeling and ordering practices.

The Court does not find persuasive the fact that the purchases were made in U.S. dollars, as many international transactions are conducted in U.S. dollars. The Court also does not find that producer Zunyi's knowledge of the destination of merchandise it supplied to Guizhou and Guilin is adequate to support a conclusion that such knowledge is indic-

ative of a pattern in the industry. Commerce's very reason for assigning a country-wide BIA dumping rate to all producers and suppliers was because it received little or no information from any manufacturers but Zunyi. *Final Results*, 59 Fed. Reg. at 26629. Commerce cannot now claim evidence of a pattern when it in fact did not have evidence from which to ascertain such pattern.

Lastly, Commerce is not obligated to make unreasonable efforts to gather information in support of its determination. *Timken Co. v. United States*, 16 CIT 142, 145, 788 F. Supp. 1216, 1219 (1992). Commerce had already sent 15 questionnaires to PRC manufacturers and exporters, in addition to those sent to the PRC government, only 3 of which were returned. In the ordering and labeling practices of the resellers, and in Sinochem's awareness it was selling to a U.S. customer, Commerce had substantial evidence indicating knowledge on the part of Plaintiff's producers and suppliers. Plaintiff had not produced evidence, other than its own statements that its suppliers did not know of the U.S. destination, which would have given Commerce reasonable grounds to further investigate the question of knowledge. Moreover, Plaintiff's suppliers were on notice that the PRC $KMnO_4$ dumping order was under review, and that their customer was listed as a reseller. *Initiation*, 56 Fed. Reg. 6621 (Feb. 19, 1991); *see A.N. Deringer, Inc. v. United States*, 13 CIT 812, 815–16, 723 F. Supp. 816, 820 (1989), *aff'd*, 904 F.2d 46 (Fed. Cir. 1990). Had they wanted to, these suppliers could have placed evidence on the record regarding whether they had knowledge of the U.S. destination, either by participating directly, or furnishing probative information to He-Ro. However, He-Ro's suppliers apparently chose not to participate, or provide He-Ro with such information if it was available. In light of these circumstances, it is not unreasonable for Commerce not to question He-Ro's suppliers.

In sum, there is substantial evidence on the record to support Commerce's determination that He-Ro's suppliers knew or should have known of the U.S. destination of merchandise.

### B. *Yue Pak:*

The administrative record reveals that Plaintiff Yue Pak did not sell from inventory; rather each sale was negotiated with a PRC import-export firm after receiving a confirmed orders. Admin. R., Pub. Doc. No. 114, Fi. 22, Fr. 50. Thus Yue Pak purchased from the manufacturer the exact quantities indicated in each customer's order. *Id.* Such orders contained explicit labeling instructions by the customer, which included "a separate 'OXIDIZER' label on each drum," an OSHA label on each drum, and a label on each drum specifying that the "DRUM COMPLIES WITH DOT SPECIFICATIONS." *See, e.g.*, Admin. R., Pub. Doc. No. 116, Fi. 23 , Frs. 10, 16–17, 19–20, 26, 31, 36–37. The oxidizer label contained a United States "800" telephone number for "CHEMTREC," a U.S. chemical trade association. *Id.* at Exh. 3, Fi. 23, Fr. 42. During the review period, Yue Pak purchased all of its $KMnO_4$ from the [   ] through

"various Chinese import-export companies." Admin. R., Con. Doc. No. 5, Fi. 33, Fr. 8. Yue Pak purchased and received $KMnO_4$, FOB, Chinese warehouse, packed and labeled. Admin. R., Pub. Doc. No. 114, Fi. 22, Frs. 50, 53. Packing was identical for both U.S. and third country shipments. *Id.*, Fi. 22, Fr. 53. PRC suppliers billed Yue Pak, and Yue Pak paid those bills in U.S. dollars. *Id.* A freight forwarder hired by Yue Pak delivered the packed merchandise to a dock in Hong Kong. Id., Fi. 22, Fr. 51. The merchandise was then blocked and braced in an ocean container and placed aboard a vessel for shipment to the U.S. *Id.*, Fi. 22, Frs. 50–51.

Yue Pak stated in its response that its PRC manufacturers and import-export companies did not know or have reason to know of the ultimate destination of the merchandise. Admin. R., Pub. Doc. No. 37, Fi. 10, Fr. 9.

Commerce argues that the special order practices, as opposed to selling from inventory, coupled with the fact that each U.S. order had specific labeling instructions which customers from other countries were not likely to require provides meaningful indication that Yue Pak's suppliers knew or should have known of the U.S. destination of the merchandise. Def.'s Br. at 21–22. Commerce further argues that the fact that Yue Pak's supplier billed Yue Pak for these purchases in U.S. dollars suggests a U.S. destination. *Id.* at 22.

Yue Pak argues that its statement in its questionnaire response that its suppliers did not know of the U.S. destination, and that packing is identical for U.S. and third country shipments are ignored by Commerce in the determination. Pl.s' Repl. Br. at 14–15. Further, Yue Pak argues that there is nothing in the record that indicates that Yue Pak only put labels on the merchandise upon specific request. *Id.* at 15. In addition, Yue Pak argues that evidence of billing in U.S. dollars is not adequate to support any conclusion about destination. *Id.* at 16. Lastly, Yue Pak argues that Commerce failed to question its supplier, and as a result, should not be permitted to draw an adverse inference from the lack of information Commerce failed to gather. Id. at 16–17.

The Court finds that the evidence cited by Plaintiff Yue Pak in support of its position does not significantly detract from the weight of the evidence cited by Commerce in support of its determination. As with He-Ro, the Court finds that the labeling content and ordering practices are adequate to support Commerce's conclusions. Also, as the Court found with He-Ro, billing in U.S. dollars is not adequate to support a conclusion about the destination of merchandise. In addition, it is not unreasonable for Commerce not to have sent a questionnaire to Yue Pak's supplier. Accordingly, Commerce's conclusion that Yue-Pak's supplier knew or should have known of the U.S. destination of merchandise is supported by substantial evidence on the record.

Plaintiffs point to *Natural Bristle Paint Brushes and Brush Heads From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 55 Fed. Reg. 42599, 42600 (Oct. 22, 1990),

as establishing the standard for which Commerce may impute knowledge of the destination of merchandise to suppliers. In that case, Commerce explained that the standard for imputed knowledge is high, and determined that when a reseller sells to countries other than the U.S., a U.S. purchaser's product specifications for a fungible commodity are not enough to establish knowledge on the part of the manufacturer of the U.S. destination. *See also Television Receivers, Monochrome and Color, From Japan; Final Results of Antidumping Duty Administrative Review*, 58 Fed. Reg. 11211, 11216 (Feb. 24, 1993) (Standard for known or should have known is "high").

The Court is troubled by what appears to be a shifting standard used by Commerce to determine whether a particular party in the chain of distribution had knowledge about the destination of the purchased merchandise. After all, as pointed out, Commerce has in several previous determinations termed the standard for establishing knowledge as "high," and conveniently made no mention of its "high" standard in establishing knowledge in this case. However, the Court is not in a position to say whether the records in those cases would have been enough to establish that those determinations were not supported by substantial evidence, let alone enough to hurdle the high standard purportedly used by Commerce. Nonetheless, the Court finds the evidence in this case adequate to support Commerce's conclusion that Plaintiffs' suppliers knew or should have known of the U.S. destination of the merchandise.

Plaintiffs are required to demonstrate to the Court that Commerce's determination is not supported by substantial evidence, or is otherwise not in accordance with law. Having failed to do so, Commerce's use of supplier's price to Plaintiffs as the USP is upheld.

II. *Foreign Market Value:*

The foreign market value of imported merchandise is typically determined by home market sales. 19 U.S.C. § 1677b (a) (1) (A). However, when goods are delivered from an intermediate country prior to importation into the U.S., the intermediate country is treated as the exporting country, and sales in that country are used to determine FMV if—

> (1) a reseller purchases the merchandise from the manufacturer or producer of the merchandise,
> (2) the manufacturer or producer of the merchandise does not know (at the time of the sale to such reseller) the country to which such reseller intends to export the merchandise,
> (3) the merchandise is exported by, or on behalf of, such reseller to a country other than the United States,
> (4) the merchandise enters the commerce of such country but is not substantially transformed in such country, and
> (5) the merchandise is subsequently exported to the United States, * * *.

19 U.S.C. § 1677b (f) (1988).

Plaintiffs argue that each of these criteria have been met and that they should be accorded intermediate country reseller status entitling them to separate rates. Pl.s' Br. at 32. Plaintiffs further argue that since there were no sales of the subject merchandise in Hong Kong, sales to third countries other than the U.S. should have been used as the basis for calculating FMV pursuant to 19 U.S.C. § 1677b(a)(1)(B). *Id.* at 32–33.

As explained above, Commerce's determination regarding whether the manufacturer knew or should have known that the merchandise was destined for the United States at the time of sale is supported by substantial evidence. Accordingly, Plaintiffs are unable to fulfill the second prong of the intermediate reseller exception under section 1677b(f)(2). The Court need not now determine whether the other prongs of that provision have been satisfied. Commerce's designation of the PRC as the country of export is therefore supported by substantial evidence and is otherwise in accordance with law.

III. *Best Information Available:*

Plaintiffs' argue that because they were the first to know of the United States destination of the merchandise, and because they were cooperative in their responses, Commerce's use of BIA is not supported by substantial evidence or otherwise in accordance with law. Pl.s' Br. at 19. Commerce argues that Plaintiffs are not entitled to separate rates, and that the uncooperativeness of the PRC $KMnO_4$ industry in the administrative review justified Commerce's use of BIA in assigning a country-wide dumping margin. Def.'s Br. at 48, 52–53.

The statute regarding best information available sets forth the following:

> [T]he administering authority * * * shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

19 U.S.C. § 1677e (c) (1988). Commerce is afforded considerable deference in determining what constitutes best information. *Allied Signal Aerospace Co. v. United States*, 996 F.2d 1185, 1191 (Fed. Cir. 1993), *cert. denied*, 115 S.Ct. 722 (Jan. 9, 1995). Commerce's methodology of assigning BIA to uncooperative respondents, and selecting as BIA the highest rate from a previous administrative review has been held permissible under the law. *Allied Signal* at 1191–92, (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed. Cir. 1990)). Furthermore, when resellers choose to use uncooperative suppliers that are under a dumping order, it is irrelevant that such resellers are cooperative in their questionnaire responses. *Peer Bearing Co. v. U.S.*, 16 CIT 799, 805–806, 800 F. Supp. 959, 965 (1992).

In the instant case, the record is clear that Commerce received little or no response from the PRC manufacturers. Of the 15 manufacturing and

exporting firms sent questionnaires, only 3 responded. *Preliminary Results*, 58 Fed. Reg. at 69330–31. The ITA is therefore justified in using BIA against the industry, and assigning the highest rate from the previous administrative review. Moreover, as discussed above, Plaintiffs' suppliers knew or should have known that the merchandise was destined for the United States. Plaintiffs therefore are not entitled to rates separate from the PRC industry. Accordingly, Commerce's use of a BIA rate of 128.94 percent against all suppliers country-wide, as well as their resellers, is supported by substantial evidence on the record and is otherwise in accordance with law.

IV. *Newly Submitted Information:*

Plaintiffs argue that information submitted in their pre-hearing briefs was improperly deleted and not considered by the ITA. Pl.s' Br. at 31. Plaintiffs argue that under the law, the ITA had a choice of either waiving its rule regarding the submission of additional information by an interested party, or gathering the updated information on its own. *Id.* at 28.

Commerce argues that the portions of Plaintiffs briefs which were deleted consisted of factual information which was filed after the deadline for such submissions and therefore properly rejected. Def.'s Br. at 54–59.

Defendant and Defendant-Intervenor argues that the ITA properly excluded Plaintiffs' information because it was submitted long after the deadline, it was not certified as accurate and complete, and it did not constitute mere corrections of clerical errors or methodological flaws. Def.'s Br. at 54–68; Intervenor's Response to Plaintiffs' 56.1 Motion For Judgment Upon Agency Record ("Int.'s Br."), at 8–18.

Section 1677f (e) addresses the timeliness of submissions and requires as follows:

> Information *shall be submitted* to the administering authority or the Commission during the course of a proceeding *on a timely basis and shall be subject to comment* by other parties within such reasonable time as the administering authority or the Commission shall provide. *If information is submitted without an adequate opportunity for other parties to comment thereon*, the administering authority or *the Commission may return the information* to the party submitting it *and not consider it.*

19 U.S.C. 1677f (e) (1988 & Supp. V 1993) (emphasis added). Thus the ITA is vested with discretion in rejecting information not timely submitted. In addition, 19 U.S.C. § 1675(f) (1988) provides that interested parties shall have the opportunity to present their views regarding ministerial errors in final determinations.

The regulations governing the submission of information do not permit Commerce to consider factual information beyond 180 days after the date of publication of the notice of initiation, or after the publication of notice of preliminary results unless such factual information is requested by Commerce. 19 C.F.R. § 353.31(a)(ii). Commerce normally

will not consider or retain in the record unsolicited questionnaire responses, and in no event will Commerce consider questionnaire responses submitted after the date of publication of the preliminary determination. 19 C.F.R. § 353.31(b)(2).

This Court has held that a remand of a final determination is appropriate for incorporation of corrections if an error is so egregious and so obvious that failure to correct it would amount to an abuse of discretion. *Tehnoimportexport v. United States*, 15 CIT 250, 258–59, 766 F. Supp. 1169, 1178 (1991). More recently, the Court of Appeals for the Federal Circuit has held that a remand is proper where errors on the part of a respondent are inadvertent, and not the result of errors in judgment. *NTN Bearing Corp. v. United States*, 74 F.3d 1205, 1208–09 (Fed. Cir. 1995).

In this case, Plaintiffs submitted factual information not previously presented in their questionnaire responses after the date of notice of the preliminary determination. This submission therefore violated the provisions of 19 C.F.R. § 353.31, and Commerce acted within the discretion vested it under 19 U.S.C. § 1677f (e) when it chose not to consider such information. Moreover, this information was not submitted to correct ministerial errors in a final determination, so as to be received under the provisions of 19 U.S.C. § 1675 (f), or to correct errors so egregious and obvious, so as to invoke *Tehnoimportexport*. Indeed, this Court specifically found that the ITA's use of Thailand as a surrogate country was not erroneous in the previous 1989 administrative review. *Novachem, Inc. v. United States*, 16 CIT 782, 787, 797 F. Supp. 1033, 1037 (1992). The information contained in Plaintiffs' prehearing briefs was offered to support a determination in favor of reseller and third country rates, and as such was the result of an error in judgment, not the result of an inadvertency. It is therefore not the sort of information permissible under the statute, regulations, and case law. Accordingly, Commerce's actions are supported by substantial evidence on the record and are otherwise in accordance with law.

CONCLUSION

For the foregoing reasons, Commerce's determination in this case is supported by substantial evidence on the record and otherwise in accordance with law, and is therefore sustained. Plaintiffs' motion for judgment upon the agency record is denied. This case is dismissed.